Filed 4/25/25  In re A.W. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Glenn)

----

| | |
|---|---|
| In re A.W. et al., Persons Coming Under the Juvenile Court Law. | C102406 |
| GLENN COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. Nos. 22JP01052, 22JP01053) |
| Plaintiff and Respondent, | |
| v. | |
| S.N., | |
| Defendant and Appellant. | |

Mother S.N. (mother) of minors A.D. (born 2019) and Z.D. (born 2021) (the minors) appeals from the juvenile court's orders denying mother's petition for modification and terminating parental rights, freeing the minors for adoption.  (Welf. & Inst. Code, §§ 366.26, 388, 395; statutory section references that follow are to the Welfare and Institutions Code.)  Mother contends the juvenile court abused its discretion

1

in denying her petition for modification and erred by failing to find that the beneficial relationship exception to adoption applied.  We affirm the juvenile court's orders.

FACTS AND HISTORY OF THE PROCEEDINGS

A.      Detention/Jurisdiction/Disposition

In December 2022, the Glenn County Health and Human Services Agency (the Agency) filed section 300 petitions alleging mother and presumed father G.D. failed to protect the minors (§ 300, subd. (b)) and the minors were suffering or at risk of suffering serious emotional damage (§ 300, subd. (c)) after the minors witnessed multiple incidents of physical and emotional abuse between their parents.  The juvenile court ordered the minors detained and entered a general visitation order providing mother with a minimum of two supervised visits, totaling four hours, each week.  The court also ordered reunification services.  Mother's services included drug and alcohol testing, substance abuse treatment, parenting education, and mental health counseling.

At the uncontested jurisdiction hearing, the juvenile court sustained the petition, declared the minors dependent children of the court, and continued supervised visits as previously ordered.  At the contested disposition hearing the juvenile court ordered the minors removed from parental custody.  The court found mother made no progress toward alleviating or mitigating the causes that required placement of the minors in foster care and set the six-month review hearing.

B.      Six- and Twelve-Month Review

In August 2023, the Agency reported mother was expecting her seventh child.  She was looking for living arrangements that the Agency would approve.  At the time, mother had attended 14 weeks of the recommended 52-week child abuse/child endangerment program and was making progress toward "her treatment goals" in individual counseling.  The Agency noted that mother was not in compliance with the required weekly counseling sessions in four of the five previous months.

2

Mother completed the required parenting program on May 24, 2023, and did well in the program. Mother also attended several Al Anon meetings. Nevertheless, the reporting social worker observed that mother had not made "any progress remaining calm when given difficult information," and she continued refusing to take responsibility for her actions or let go of things that are not within her control. Overall, mother was "resistant to any change in her parenting style."

The assigned social worker acknowledged mother complied with "several of the services outlined in her case plan" but she remained concerned about mother's unwillingness to recognize her role in the minors' detention. Mother insisted the Agency was corrupt and "making every effort to make her fail." Mother could present as calm and regulated but was "paranoid, hostile[,] and unstable when presented with conversations or information that challenge[d] her narrative." And, as reported by the Agency, mother was dishonest with the social worker regarding her living situation and her relationship with the presumed father.

Based on both parents' "lack of behavioral change, lack of engagement in court-ordered services, hostile communication and apparent paranoid thoughts," the Agency concluded it was unlikely the minors would be returned by the 12-month permanency hearing. If the juvenile court were inclined to continue reunification services, the Agency asked the court to order a psychiatric evaluation for both parents.

Mother was late to the six-month review hearing on December 11, 2023. She appeared, wearing a hospital wrist band, after several witnesses testified. The court continued the hearing to January 22, 2024, for a combined six- and twelve-month hearing.

Mother did not appear at the January 22, 2024, hearing. After hearing from counsel, the juvenile court terminated services for both parents, set a section 366.26 hearing for May 13, 2024, and a post permanency review hearing for July 22, 2024.

C.     April 2024-August 2024

On April 18, 2024, acting without appointed counsel, mother filed a section 388 petition for each minor asking the juvenile court to return the minors to her or, alternatively, to give her another chance at reunification.  She argued that she was "falsely misrepresented" by her social worker and "not represented" by her appointed counsel.  She asserted the change in order would be better for the minors because she feared for the minors' safety in their foster home.  The court set the petitions for hearing on May 13, 2024, alongside the section 366.26 hearing.

The Agency's May 3, 2024, selection and implementation report recommended parental rights be terminated and adoption the permanent plan.  The minors' foster parents were found "suitable and committed to" adopting the minors.  During the reporting period, mother's visitation was gradually decreased to once monthly, supervised by the Agency.  Mother consistently attended her scheduled visitation but the Agency reported the visits were not "beneficial" for the minors:  "During her limited time with the [minors], she prioritizes examining their bodies, taking pictures and videos, talking on her phone, interrogating the [minors], and making complaints to staff and law enforcement."

Additionally, the Agency noted that during their visits, mother demonstrated "an inability to consistently meet the [minors'] psychological and emotional needs, fails to consistently and appropriately respond to their non[-]verbal [c]ues, and does not intervene when the children are engaging in unsafe play, even when directed to by the [Agency]."  Mother's interaction with the minors was not "conducive to creating or maintaining a healthy and stable parent-child relationship, bond[,] or attachment."

The parties appeared before the juvenile court on May 13, 2024, and the court continued the section 366.26 hearing to August 12, 2024.  Mother asked for increased

4

visitation in the interim, and the court acceded to her request, over the objection of minor's counsel.

The Agency filed an addendum to their report on August 7, 2024. Mother's adult child T.N. contacted the assigned social worker saying she was concerned mother was lying to the Agency. T.N. told the assigned social worker that mother and the presumed father continued to engage in "mutual domestic violence," often in the presence of their infant daughter. The Agency continued to recommend terminating parental rights and freeing the minors for adoption.

On August 12, 2024, before appearing in court, mother filed a section 388 petition for each minor, without the assistance of appointed counsel. She asked the court to reinstate reunification services for six months. In support of her petition, mother said she continued with her counseling, and she completed her parenting class. In addition, mother was attending codependency classes, anger management classes, and a domestic violence class. She had housing through the Salvation Army, and she was working as a nanny. She argued that no one cared more about the minors than she did, and she continued to assert the minors were being abused in their foster home. She also said the assigned social worker was biased against her and "cruel."

When the parties appeared before the court, mother's counsel asked to be relieved — there had been a complete breakdown in communication. The court granted counsel's request and appointed new counsel. The court continued the hearing to September 9, 2024.

### D.     September 2024

On September 9, 2024, mother moved the juvenile court to appoint her new counsel. The court denied her motion. The court then heard testimony from mother, the presumed father, and the assigned social worker. The social worker testified that mother was disruptive during the minors' vaccination appointment on August 5. Mother did not

want the minors to be vaccinated so, rather than hold either of the minors, she became angry with the social worker and medical professionals. Her face red, mother clenched her fist and rocked back and forth, raising her voice. Mother was asked to leave the room.

The social worker also testified about several videos she reviewed. In one video the presumed father appeared intoxicated, and mother was "comforting" him. In another, the presumed father appeared to be "stumbling and agitated"; mother was pulling on him or pushing him as he was "trying to get away from her." Several videos captured mother and the presumed father fighting over his consumption of pornography, often they were yelling at each other. The social worker also reviewed a video depicting mother's infant daughter in a car, unattended for approximately 30 minutes.

The social worker had "several concerns" about returning the minors to mother and the presumed father. The family had been engaged with the Agency for more than 18 months and there was substantial evidence the domestic violence between them continued. She also was concerned that mother was either in denial about what was going on or was lying. And she was concerned that mother was in denial about the harm done to the minors who witnessed the violence.

Mother was going to her classes but there was no evidence mother was benefitting from them. Mother continued to blame the Agency and the presumed father for the minors being removed. According to mother, "she has been nothing short of a wonderful mother and has never put her children in a potentially harmful or a harmful situation." Mother continued in the cycle of abuse and there were no changes to her behavior. The social worker also found it "very concerning . . . that there has been no stability in their housing, in their relationship status, [or] in their communication with the [Agency] for the duration of this case."

After considering the testimony and written evidence submitted, the court denied mother's section 388 petitions. The court found "this is a circumstance where there are

changing circumstances, not changed circumstances." At 21 months in, mother had not shown significant progress toward reunification. The court told mother "taking classes is not the point of taking classes. The point is to learn from those classes . . . ." Mother had not learned and had not changed her behavior.

The court continued the section 366.26 hearing to October 28, 2024, where the court would also hear the de facto parent request filed by the minors' foster parents.

E.        October 2024

On October 25, 2024, mother and the presumed father, without their appointed counsel, filed a joint section 388 petition. Again, they asked the juvenile court to reinstate services. They argued that mother stayed in her classes, graduated from "New Beginnings," and participated in services on her own through the Salvation Army. They also argued the presumed father was now sober and responsible. They again claimed the assigned social worker was biased against them and corrupt.

Mother's adult daughter S.L. filed a similar section 388 petition, asking the minors be returned "home so we can be together." In support of her petition, S.L. said, "mom & dad take very good care of me."

On October 28, 2024, the juvenile court found the minors' foster parents to be the de facto parents over mother's objection. The court took notice of the evidence submitted at the September 9, 2024, hearing. The court then heard testimony from mother and the family's visitation monitor Xochitl J. Xochitl testified mother visited the minors regularly; she brought them healthy snacks to eat and appeared to care for them. Recently, the visits were in the park, which the minors loved; they had fun and enjoyed their visits outside.

Xochitl also observed that, during the visits, mother spent "too much time trying to make the kids say they miss mom" and looking for anything "wrong" that she could blame on the Agency or the foster parents. In Xochitl's opinion, mother was "very

7

restrictive on the kids," what they were doing and how they were talking.  Mother also questioned the minors about what was happening in their foster home.  She would examine their bodies and take pictures at nearly every visit.  At the end of their visits, the minors did not cry; they would just say good-bye.  And the minors never, on their own, said they missed mother or told her they love her, only when she asked them.

After considering the evidence presented, the juvenile court found the minors were adoptable and terminated parental rights.  The court also denied the section 388 petitions filed on October 25, 2024.  The court found the parties were filing the section 388 petitions "on their own without their attorneys' knowledge.  They are represented[;] therefore, the attorneys are responsible for making requests to change orders."  In any event, the court ruled, the changes requested in the petitions did not promote the best interest of the minors.

The same day the juvenile court terminated parental rights, mother filed her notice of appeal.  In her notice of appeal, mother indicates she is appealing from orders issued on October 28, 2024, and September 23, 2024.

DISCUSSION

I

*Forfeiture/Appealability*

Respondent contends mother has forfeited her right to challenge the juvenile court's order terminating her parental rights.

Respondent correctly states the law:  "In order to obtain review on appeal from the final order in the section 366.26 hearing of issues subsumed within an order setting a section 366.26 hearing, a party must first timely file a writ petition seeking review of the order setting the section 366.26 hearing; the petition must substantively address the specific issues to be challenged; the petition must be supported by an adequate record;

8

and finally, the petition must have been 'summarily denied or otherwise not decided on the merits.' " (*Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501, 1507.)

Respondent, however, is not correct that the law precludes mother from pursuing this appeal. The appeal here is not from an order setting the section 366.26 hearing or an order "subsumed within the order setting a section 366.26 hearing," it is from orders terminating parental rights and denying section 388 petitions at the section 366.26 hearing. Failure to file a writ petition from the order setting a section 366.26 hearing does not preclude appeal of the findings and orders made at the section 366.26 hearing itself. (*Joyce G. v. Superior Court, supra,* 38 Cal.App.4th at p. 1507 & fn. 3.)

Mother timely filed her notice of appeal. In her notice of appeal, mother clearly identified the orders from which she appealed as the orders denying her section 388 petitions and terminating her parental rights. Her appeal from these orders is properly before this court and her claims are preserved for our review.

II

*Section 388 Petition*

Mother contends the juvenile court abused its discretion in denying her section 388 petition. We disagree.

A.      Orders Appealed From

As an initial matter, mother acknowledges she filed several section 388 petitions in the juvenile court, all of which were denied. Her argument on appeal, however, appears to refer only to a singular petition, which she does not identify by date but only by citation to the record. That citation is to the section 388 petition mother filed on August 12, 2024. The juvenile court denied that petition on September 9, 2024, following an evidentiary hearing.

Mother's notice of appeal does not include the September 9, 2024, order; it includes the October 28, 2024, orders and a September 23, 2024, order that is not part of

9

the record.  Construing the notice of appeal liberally, as we must, we assume the September 23rd date is a typographical error and we interpret the notice to apply to the September 9, 2024, order.  (Cal. Rules of Court, rule 8.100(a)(2).)

B.    Legal Principles

Section 388, subdivision (a) provides that a parent of a dependent child may petition the juvenile court "upon grounds of change of circumstance or new evidence . . . for a hearing to change, modify, or set aside any order of court previously made."  Section 388 permits modification of a dependency order if a change of circumstance or new evidence is shown and if the proposed modification is in the best interests of the minor.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 526.)

"After the termination of reunification services, the parents' interest in the care, custody and companionship of the child are no longer paramount.  Rather, at this point 'the focus shifts to the needs of the child for permanency and stability.' "  (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.)  The juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability.  (*Ibid*.; *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.)  In assessing the petition, the court may consider the entire history of the case.  (*In re Justice P.* (2004) 123 Cal.App.4th 181, 189.)  " 'A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests.' "  (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206.)  The child's "best interests are not to further delay permanency and stability in favor of rewarding [the parent] for [his or] her hard work and efforts to reunify."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 527.)

The party petitioning for modification has the burden of proof by a preponderance of the evidence of both changed circumstances or new evidence and that the requested

order would serve the minor's best interests. (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.) A modification "petition is addressed to the sound discretion of the juvenile court and its decision will not be disturbed on appeal in the absence of a clear abuse of discretion." (*In re Jasmon O.* (1994) 8 Cal.4th 398, 415.) The juvenile court did not abuse its discretion in denying mother's petition.

C.     Analysis

Mother has failed to demonstrate her August 12, 2024, section 388 petition, which sought reinstatement of reunification services, is supported by changed circumstances.

In support of her petition, and to demonstrate changed circumstances, mother offered evidence that after reunification services were terminated, she continued to participate in services voluntarily. She remained in counseling and began taking several new classes, including classes on codependency, anger management, and domestic violence. She also completed a parenting class. Mother has, however, been engaged in these and similar services since the minors' detention in 2022. And, despite engaging in these services, mother continued to participate in a relationship with the presumed father that was marred by domestic violence.

Mother fails to cite any authority supporting her position that, following termination of reunification services, her ongoing and voluntary participation in services constitutes changed circumstances sufficient to support a section 388 petition. (Accord *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [mother's "recent sobriety reflects 'changing,' not changed, circumstances" in light of her "history of drug relapses"].)

On the other hand, " '[a] petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent . . . might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.] " '[C]hildhood does not wait for the parent to become adequate.' " ' " (*In re Mary G., supra,* 151 Cal.App.4th at p. 206.)

Here, the weight of the evidence demonstrates that, despite her ongoing participation in these services, mother remained adamant it was not her fault the minors were removed.  She continued to blame the presumed father, the Agency, and others; by mother's own estimation, she was a wonderful parent.  It was the system that failed the minors, not her.  As the social worker said, mother continued to demonstrate a complete unwillingness to change her parenting style or her relationship with the presumed father.  These are not changed circumstances.  They are, at most, changing circumstances.  The juvenile court did not abuse its discretion in denying mother's August 12, 2024, section 388 petition.

To the extent mother challenges the juvenile court's October 28, 2024, order summarily denying the section 388 petitions she filed on October 25, 2024, we also find no error.  Mother filed these petitions pro se, despite being represented by appointed counsel.  The Supreme Court has long recognized that motions "and briefs of parties represented by counsel must be filed by such counsel" unless the filings relate to the adequacy of counsel's representation.  (*People v. Clark* (1992) 3 Cal.4th 41, 173, abrogated on another ground as stated in *People v. Edwards* (2013) 57 Cal.4th 658, 704-705.)  "Where the party is not permitted personally to participate in conducting the case, pro se filings by that party may be returned unfiled [citation] or, if filed, may be stricken." (*People v. Harrison* (2001) 92 Cal.App.4th 780, 788.)  Accordingly, the court acted well-within its discretion to summarily deny those petitions.

### III

### *Section 366.26 Hearing*

Mother contends the juvenile court erred by failing to apply the beneficial parental relationship exception to adoption.

At the section 366.26 selection and implementation hearing, a juvenile court must choose one of the several " 'possible alternative permanent plans for a minor child. . . .

The permanent plan preferred by the Legislature is adoption. [Citation.]' [Citations.] If the court finds the child is adoptable, it must terminate parental rights absent circumstances under which it would be detrimental to the child." (*In re Ronell A.* (1996) 44 Cal.App.4th 1352, 1368.) There are only limited circumstances that permit the court to find a "compelling reason for determining that termination [of parental rights] would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) One such circumstance is the beneficial parental relationship exception. (§ 366.26, subd. (c)(1)(B)(i); *In re Caden C.* (2021) 11 Cal.5th 614, 629.)

The party claiming the exception has the burden of establishing the existence of any circumstances that constitute an exception to termination of parental rights. (In *re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637; *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1252; Cal. Rules of Court, rule 5.725(d)(2).) For the beneficial parental relationship exception to apply, "[t]he parent must show regular visitation and contact with the child, taking into account the extent of visitation permitted. Moreover, the parent must show that the child has a substantial, positive, emotional attachment to the parent — the kind of attachment implying that the child would benefit from continuing the relationship. And the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (Caden C., at p. 636.)

The beneficial parental relationship exception to adoption "must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576.) The factual predicates of the exception must be supported by substantial evidence, but the juvenile court exercises its discretion in weighing that evidence and determining detriment. (*In re Caden C.*, *supra*,

11 Cal.5th at pp. 639-640.) We do not substitute our judgment for that of the juvenile court as to what is in the child's best interests. (*Id*. at pp. 640-641.)

Here, it is not in dispute that mother maintained consistent visitation with the minors. However, mother did not present sufficient evidence that her relationship with the minors was so significant that severance of those relationships would outweigh the benefits of adoption. (Cf. *In re Caden C.*, *supra*, 11 Cal.5th at pp. 636-637.) Both the assigned social worker and the visitation monitor reported that during their visits, mother's interaction with the minors was neither positive nor beneficial. She spent a great deal of the visits coaching the minors to say they loved her and missed her. She inspected their bodies for any sign of injury or abuse, took pictures of their bodies with her phone, and interrogated them about their foster parents.

During visits, mother's focus was often on her phone. She failed to intervene when either of the minors would become emotionally dysregulated, she even failed to intervene when their playing put them at risk of injury. When the minors were getting their vaccines, mother refused to hold them. Mother was, instead, focused on her anger toward the social worker and medical personnel. Mother made no effort to bond with the minors during these visits. She did not engage the minors in positive interactions but focused on finding evidence that the Agency or the minors' foster parents were doing something wrong. Such evidence supports a finding that neither minor would benefit from a continuing relationship with mother. (See *Caden C.*, *supra*, 11 Cal.5th at p. 632 [one consideration is positive or negative effect of interaction between parent and child].)

The minors were removed from mother's custody when they were three years old and 16 months old, respectively. At the time of the October 2024 selection and implementation hearing, the minors were nearly five and three years old respectively and they had not been in mother's care for nearly two years. The juvenile court could reasonably find against mother on this element based on the short time they spent in mother's custody and the fact that neither minor was crying or sad when taken back from

mother at the end of their visits. (See *In re Kathrine J.* (2022) 75 Cal.App.5th 303, 318 ["beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent"].)

The juvenile court could reasonably find that foregoing stability and permanence in favor of a tenuous placement to provide an opportunity for continued contact with mother would not be in the minors' best interests. In light of the minors' young age, the limited portion of their lives spent in mother's care, the negative effects mother's visits had on the minors, and the minors' need for stability as well as the stability the minors were enjoying in their foster home, there was insufficient evidence demonstrating that terminating parental rights would cause the minors to suffer detriment from the loss of a significant bond that would outweigh the benefits of permanency. There was no error in finding the beneficial parental relationship exception did not apply.

DISPOSITION

The juvenile court's orders are affirmed.

_____
HULL, J.

We concur:

_____
EARL, P. J.

_____
KRAUSE, J.